FILED
2010 Mar-29 AM 11:04
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **AGRICULTURAL PRODUCTS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.  2:08-CV-1747-SLB** |
| | ) | |
| **L A F A R G E   A G G R E G A T E S** | ) | |
| **SOUTHEAST, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | | |
| **L A F A R G E   A G G R E G A T E S** | ) | |
| **SOUTHEAST, INC.,** | ) | |
| | ) | |
| **Counter Claimant,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **AGRICULTURAL PRODUCTS,** | ) | |
| | ) | |
| **Counter Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on defendant's Motion for Summary

Judgment.   (Doc. 13.)[1]   Plaintiff Agricultural Products has sued defendant Lafarge

Aggregates Southeast, alleging that defendant breached the contract with plaintiff and that

it failed to pay plaintiff's commissions.  Defendant has asserted a counterclaim for breach

of contract based on unpaid invoices.  Upon consideration of the record, the submissions of

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 13), is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Mullins v. Crowell*, 228 F.3d 1305, 1313-14 (11th Cir. 2000)(citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608-09 (11th Cir. 1991)); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor.

2

*See id.* at 255.  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988))(emphasis added).

## II. <u>STATEMENT OF FACTS</u>

Defendant is in the business of mining and processing various products, including Agricultural Limestone ("AgLime"), which it produces at a facility in Calera.  (Doc. 15, Ex. A at 49; *id.*, Ex. B ¶ 1.)  On or about October 14, 2003, the parties entered into a Sales Agency Agreement, in which defendant appointed plaintiff "as its exclusive sales agent for [AgLime].  (*Id.*, Ex. B ¶ 1.)  The Agreement provided:

Agricultural Products LLC undertakes performance of the following duties and obligations:

a. **Orders Forwarded to Lafarge – Not Binding Until Accepted**. Agricultural Products LLC shall forward all orders taken by Agricultural Products LLC or Agricultural Products LLC staff to Lafarge as quickly as possible.  No order shall be binding upon Lafarge until accepted by Lafarge.

b. **Sales Price.**  Agricultural Products LLC and Agricultural Products LLC staff will make quotations and take orders at those prices and terms only as are set by Lafarge from time to time.  Lafarge agrees to give Agricultural Products LLC thirty (30) days advance notice of changes to the selling price or terms of [AgLime].

c. **Billing and Collection; Remuneration to Agricultural Products LLC.**  Agricultural Products LLC shall invoice customers (at sales price established by Lafarge) and also shall be responsible for collection activities relating to its sales of [AgLime] on Lafarge's behalf under this Agreement.  Agricultural Products LLC shall remit

3

payment to Lafarge for such sales on or before the 15th day of the second month following the month in which sales are made. For example, for sales made in May, Agricultural Products LLC shall remit payment to Lafarge by July 15. Each such payment shall be equal to eighty-eight percent (88%) of the aggregate sales price for the related sales of [AgLime], the remainder of such aggregate sales price being retained by Agricultural Products LLC as its full remuneration for its services under this Agreement. As used in the immediately preceding sentence, "aggregate sales price" means the total of all invoices for sales of [AgLime]. Each payment shall be accompanied by a statement of sales during the relevant period, together with a computation of the sum due to Lafarge. Agricultural Products LLC understands and agrees that it shall be responsible for any and all customer bad debts, and that the payments to Lafarge called for under this paragraph shall not be reduced for amounts not collected from customers.

(*Id.*, Ex. B ¶ 3.) The Agreement also contained an early termination provision, which stated:

This Agreement may be terminated by Lafarge . . . at any time or extended term and upon at least three (3) weeks notice, upon the occurrence of the following events: Agricultural Products LLC insolvency, including the filing of a voluntary or involuntary petition in bankruptcy court against Agricultural Products LLC, the execution of an assignment for the benefit of Agricultural Products LLC creditors, a levy or attachment on Agricultural Products LLC property or placing of a lien on Agricultural Products LLC property that is not discharged within 30 days. Notice of termination under this paragraph 7 shall be given by Lafarge no later than three (3) weeks after the occurrence of the event giving rise to the termination. If Lafarge fails to notify Agricultural Products LLC of the termination of this Agreement within the three-week period, Lafarge shall be deemed to have waived Lafarge's right to terminate. Such waiver shall only apply to the particular event that gave rise to the right to terminate and not as to any other events, past or future. In addition, Lafarge may terminate this Agreement for convenience upon one hundred twenty (120) days written notice to Agricultural Products LLC.

(*Id.* ¶ 7.)

In July 2004, defendant notified plaintiff that it would began billing plaintiff on a

per-ton pricing schedule, rather than requiring plaintiff to remit 88 % of the aggregate sales

price.  (*Id*., Ex A at 33.)  The change was implemented because the "structure as outlined in the contract was an administrative burden, and to make the tracking of sales and payments easier."  (*Id*. at 35.)  Todd Gallups, the sole manager and member of Agricultural Products, testified that after the change to per-ton pricing, plaintiff remitted payment to defendant based on the per-ton price from 2005 until 2008.  (*Id*., Ex. C at 27-29; doc. 19 ¶ 1.)  Under this method, plaintiff retained the price paid by its customers less the per-ton price set by defendant.  (Doc. 15, Ex. C at 109-10.)

Plaintiff has contended that defendant sold AgLime directly to Strata Materials, in violation of the Agreement.  (Doc. 15, Ex. C at 115; *id.,* Ex. A at 86.)  Gallups testified, "[Defendant] loaded product for [Strata] to convert – to make [AgLime] out of to go in direct competition with me."  (*Id*., Ex. C at 115.)  He said:

> [Defendant] sold aggregate, small aggregate, that you use to crush down to make into [AgLime] that was the sole purpose for them to load this product for [Strata] to go to Mobile Asphalt.  [Strata] was using the same product that they used – that they made [AgLime] out of to give to – not give, but sell to [Strata] to sell to Mobile Asphalt to produce [AgLime] that went in direct competition with me.  [Defendant] circumvented the contract.

(*Id*. at 115-16.)

Defendant has presented evidence that it did not sell anything, including AgLime, to Strata.  (*Id*., Ex. A at 86.)  Josh Isbill, defendant's Commercial Manager, testified:

> I am aware of a company that was utilizing Lafarge's rail to load purchases of products from a third party to be shipped to Mobile, but the product was not purchased from Lafarge.  It was simply purchased from a third party and Lafarge's property was used to stockpile and load rail cars for shipments down into Mobile.  . . .

. . .

> I'm aware of Lafarge allowing product to be loaded at our site.  It was
> not Lafarge product.  Lafarge was paid a fee to allow that product to be loaded.
> When Lafarge was notified . . . by Mr. Gallups that the product was being
> further crushed or ground to make [AgLime], Lafarge, my understanding is,
> immediately stopped allowing the product to be shipped through our site.

(*Id.*, Ex. A at 85.)  Gallups testified that Strata's owner, Roger Bass, told him that he had

purchased the aggregate from Lafarge for $2 per ton.  (*Id.*, Ex. C at 116-17.)  However, he

testified that he had no first-hand knowledge regarding Strata's dealings with defendant.  (id

at 118.)

Nevertheless, Gallups objected to the Strata transactions and claimed they

circumvented the terms of the exclusive Sales Agency Agreement with defendant and

adversely impacted his sales in the Mobile area.  (*See* Doc. 19, Ex. A ¶ 3.)  Wayne Wallace,

defendant's Area Sales Manager, testified that after defendant learned that Strata was using

the product to produce AgLime, it notified Strata it would not continue to allow Strata to use

its railway.  (*Id.*, Ex. D ¶¶ 10-12.)  Wallace testified that defendant's decision to terminate

the agreement with Strata was made "[i]n order to prevent damage to Lafarge's business

relationship with Todd Gallups and Agricultural Products and to protect Lafarge's interest

in maintaining its market-share of AgLime sales."  (*Id.* ¶ 11.)

Plaintiff failed to deliver its scheduled payment for December 2007, and subsequently

failed to make the payments in January 2008, February 2008, March 2008, and April 2008.

(*Id.* at 160-61.)  Plaintiff contends that it does not owe defendant those payments because it was due a set-off against its unpaid commissions.  (Doc. 19, Ex. A ¶ 4.)

Nevertheless, plaintiff gave defendant a check for $75,698.30 in early January 2008. (Doc. 15, Ex. E; *id.*, Ex. A at 103-04.)  The check was ultimately returned to defendant  due to insufficient funds in plaintiff's account.  (*Id.*, Ex. A at 104.)  Plaintiff sent defendant a replacement check for $60,505.86, which defendant negotiated.  (*Id.* at 100 and ex. 11; doc. 19, Ex. A ¶ 5.)

Defendant placed plaintiff's account on hold in early February 2008.  (Doc. 15, Ex. C at 46.)  Wallace and Dave Marsh, defendant's Vice President of South Central Aggregates, met with Gallups regarding plaintiff's failure to meet the payment deadlines.  (*Id.*; *id.*, Ex. A, ex. 4; *id.*, Ex. D ¶ 1. )   Gallups told Wallace and Marsh:

> [I]n the coming months all this was going to be made up, but that . . . [it had] 12 percent that [it] owed me from previous sales and . . . they did not want to listen to it.  They made me come up with a payment scheme in order to get my accounts open again, and that was it.  We left and [were] going to meet again. It all went downhill.

(*Id.*, Ex. C at 47.)   He testified that Marsh denied that defendant owed plaintiff 12% commission on the per-ton pricing sales, and Marsh told Gallups that he "had no credibility." (*Id.* at 50.)

Gallups testified, "After the pricing policy concerning the sales price of the product charged by Lafarge to Ag Products was changed by Lafarge during the summer of 2004, Ag Products became entitled to 12% of the per-ton sales price of the product between Lafarge

and Ag products, in addition to whatever Ag Products charged its customers." (Doc. 19 ¶ 4.) He also testified that the only reason plaintiff did not remit payment to defendant was because, according to his calculations, defendant owed plaintiff over $237,383.16 in unpaid commissions of the per-ton price following the 2004 change to per-ton pricing in February 2008. (Doc. 15, Ex. C at 137.) He denies that plaintiff owed defendant any money at the time defendant terminated the Agreement. (*Id*. at 53.)

The October 2003 Agreement states that plaintiff's commission is based on "aggregate sales prices," which the Agreement defines as "the total of all invoices for sales of Products." (*Id*., Ex. B ¶ 3(c).) According to defendant's calculations, which plaintiff does not dispute, plaintiff earned more than 12% on its sales after the change to per-ton pricing and had a gross profit revenue of $3,309.43 more than it would have received if it had retained 12% of the total of the aggregate sales price during this period. (*Id*., Ex. F ¶ 10.)

On February 21, 2008, defendant's counsel sent plaintiff a letter, purporting to terminate the parties' Agreement; the letter states:

> Agricultural Products has repeatedly failed to remit timely payment to Lafarge as mandated by section 3(c) of the [Agreement], and the delinquent amounts due from Agricultural Products to Lafarge currently total $233,035.10 (the "Past Due Amount"). . . . This Past Due Amount includes amounts due pursuant to a check that was returned for insufficient funds. For your information, Alabama law provides a minimum $500.00, maximum $5,000.00 fine or imprisonment for up to 3 years for bounced checks.
>
> As a result of this material breach, Lafarge hereby terminates the [Agreement], effective immediately, and demands that Agricultural Products send payment in full of the Past Due Amount to the undersigned on or before

March 15, 2008.  We anticipate your prompt cooperation in this matter in order
to prevent any further civil and/or criminal legal action by Lafarge.

(Doc. 16, Ex. G at 1.)[2]

Plaintiff's account statement with defendant on February 21, 2008 revealed that
plaintiff had failed to remit $237,383.16 to defendant for sales made during the months of
October 2007 through February 2008.  (Doc. 16, Ex. H; *see also* doc. 15, Ex. C, ex. 12.)
According to defendant, and not disputed by plaintiff, (*see* doc. 18), this amount is based on
the following monthly invoices that plaintiff has not paid:  (a) October 2007 sales – due
December 15, 2007: $58,728.69; (b) November 2007 sales – due January 15, 2008:
$63.742.86; (c) December 2007 sales – due February 15, 2008: $47,299.95; (d) January 2008
sales – due March 15, 2008: $41,736.64; and (e) February 2008 sales – due April 15, 2008:
$25,875.02.[3]  (Doc. 14 at 9-10 [citing doc. 15, Ex. F, exs. 1-5]; doc. 18 at 9.)

---

[2]Plaintiff argues that defendant waived and/or modified the timing of its payment
obligations through the parties' past dealings and course of conduct, (doc. 15, Ex. A at 94-95;
doc. 19, Ex. A ¶ 8); and, even if the timing of its payments was not modified, plaintiff is still
entitled to a set-off for unpaid commissions, (*see* doc. 15, Ex. C at 47-50, 136-37; doc. 19,
Ex A ¶ 4).

[3]According to the court's calculations, the invoices in Exhibit F total $232,766.31:
Exhibit 1 (October 2007 invoices) $57,088.14; Exhibit 2 (November 2007 invoices)
$63,505.43; Exhibit 3 (December 2007 invoices) $45,420.48; Exhibit 4 (January 2008
invoices) $41,092.77; and Exhibit 5 (February 2008 invoices) $25,659.49.  Because plaintiff
does not dispute defendant's calculations, the court deems plaintiff to have admitted the total
of the invoices is $237,383.16.  (*See* doc. 8, Ex. A at 4 ["All material facts set forth in the
statement required of the moving party will be deemed to be admitted for summary judgment
purposes unless controverted by the response of the party opposing summary judgment."].)

On March 11, 2008, plaintiff filed the instant action in the Circuit Court of Jefferson County, Alabama.  (Doc. 1, Att. [Complaint and Application for Preliminary and Permanent Injunctive Relief].)  In its Complaint, plaintiff alleged:

## BREACH OF CONTRACT

. . .

2.  The Plaintiff and Defendant, on October 14, 2003, entered into a written contract whereby the Plaintiff was designated as the Defendant's exclusive sales agent for agricultural limestone ("the product") mined from Defendant's quarry in Calera, Alabama.  The aforementioned contract remains in full force and effect.

3.  On or about February 15, 2008, and on other dates previous thereto, the Defendant breached the contract by failing to honor valid sales of the product which were arranged by Plaintiff, and further, by selling the product directly to customers without paying the Plaintiff commissions to which it was entitled.

. . .

## UNPAID COMMISSIONS

1.  This claim is brought pursuant to CODE OF ALABAMA (1975) § 8-24-1, et seq., otherwise known as [t]he "Sales Representative's Commission Contracts Act."

. . .

3.  The Defendant is an entity which engages in the business of manufacturing and/or distributing products for sale to customers who purchase the products for resale.

4.  The Defendant utilizes the Plaintiff to solicit orders for the said products.

5.  The Defendant compensates the Plaintiff, in whole or in part, by commission.

6.  The Plaintiff is a person engaged in the business of soliciting, on behalf of the Defendant, orders for the purchase of principal's products.

7.  The Plaintiff is contractually designated as Defendant's exclusive sales agent for Defendant's agricultural limestone product produced at Defendant's Calera, Alabama plant[;] however, the Defendant has failed and refused to pay the Plaintiff the commissions upon all such limestone products distributed by Defendant from said plant.

(Doc. 1, Att. [Complaint] at 3-4.)

Defendant removed the case on September 22, 2008.  (Doc. 1.)  Thereafter, it filed its

Answer and Counterclaims for breach of contract, which stated:

### COUNT I

1.  The October 14, 2003 Sales Agency Agreement (the "Agreement") between [defendant] and [plaintiff] requires [plaintiff] to remit payment to [defendant] for all sales made by [plaintiff] of [defendant's] Agricultural Limestone. . . .

2.  Under the Agreement, [plaintiff] is required to pay to [defendant] an amount "equal to eighty-eight percent (88%) of the aggregate sales price for the related sales of [Agricultural Limestone]." The Agreement further requires [plaintiff] to remit payment to [defendant] for such sales "on or before the 15th day of the second month following the month in which sales are made."

3.  [Plaintiff] has breached the Agreement by failing to make the payments to [defendant] that are required under the Agreement.

4.  [Defendant] has been damaged by [plaintiff]'s breach in the amount of $233,035.10.  That amount is based upon the following invoices, less unapplied credits, that have not been paid to [defendant]:

(a)  October 2007 sales – due December 15, 2007:  $60,069.09;
(b)  November 2007 sales – due January 15, 2008:  $64,124.78;

11

(c)   December 2007 sales – due February 15, 2008:  $47,493.15;

(d)   January 2008 sales – due March 15, 2008:  $41,736.64; and

(e)   February 2008 sales – due April 15, 2008:  $21,524.70.[4]

. . .

## COUNT II

. . .

6.   On or about January 1, 2008, [plaintiff] delivered check #2424 in the amount of $75,698.39 (the "Check") to [defendant] as payment under the Agreement.

7.   The Check was returned as unpaid by [plaintiff's] financial institution.

8.   The Check represents a binding agreement between [defendant] and [plaintiff] for payment in the amount of $75,698.39.   [Defendant] has requested [plaintiff] satisfy the amount of the obligation, but [plaintiff] has failed to do so.

9.   [Plaintiff] has breached the agreement represented by the Check, and [defendant] has been damaged in the amount of $75,698.39.

(Doc. 2 at 7-9 [footnote added].)

---

[4]The court notes that these amounts differ from the amount claimed by defendant in its Motion for Summary.  (*Compare* doc. 2 ¶ 4 *with* doc. 14 at 9-10.)  Because plaintiff does not dispute the calculations in defendant's Motion for Summary Judgment, the court assumes that those numbers are correct.  See, *supra*, note 3.

# III. DISCUSSION

## A. PLAINTIFF'S BREACH OF CONTRACT CLAIMS

Plaintiff's Complaint alleges that defendant breached the parties' Sales Agency Agreement "by failing to honor valid sales . . . which were arranged by Plaintiff," and "by selling the product directly to customers without paying the Plaintiff commissions to which it was entitled." (Doc. 1, Att. [Complaint at 3].) The parties appear to agree that plaintiff also claims defendant breached the Agreement when it "improperly terminated the Agreement," and when it "failed to pay [plaintiff] a 12 percent commission for the entire term of the Agreement." (Doc. 14 at 12; doc. 18 at 14.) These claims are not contained in the Complaint. However, because defendant never objected to these claims, the court finds that it has implicitly consented to the amendment of plaintiff's Complaint. *See Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 879 (7th Cir. 2005)(applying Fed. R. Civ. P. 15(b) to pretrial proceedings to hold that the complaint was amended with defendant's implicit consent because "defendant went through four years of discovery and other pretrial maneuverings without objecting to the fact that its opponent was patently engaged in endeavoring to prove racial as well as age discrimination," which was not included in her complaint), *quoted in Singh v. Holy Cross Hosp.*, 252 Fed. Appx. 89, 92 (7th Cir. 2007)("But we have held that any issue that is '(pre)tried by implied consent of the parties' is properly before the district court on a motion for summary judgment, regardless whether the complaint was amended to include it."); *see also Handzlik v. United States*, 93 Fed. Appx. 15, 17 (5th

Cir. 2004)("In this circuit, however, it seems that Rule 15(b) may apply at the summary judgment stage.  Thus, when both parties squarely address a claim in their summary judgment briefs, it may be argued that the complaint was constructively amended.")(internal citations and quotations omitted).

### 1.  Failing to Honor Valid Sales and Improper Termination

The February 21, 2008, letter purports to terminate the parties' Agreement based on plaintiff's "material breach."  (Doc. 16, Ex. G.)  Defendant contends, "[Plaintiff's] (1) outright refusal to make the payments due and (2) failure to meet strict payment deadlines established after it failed to meet the Agreement's payment schedule led to [defendant's] proper termination of the Agreement in February of 2008." (Doc. 21 at 7.) Plaintiff contends that it only delayed its payments and that the parties had previously agreed to this "modification" of the Agreement's payment schedule.

However, Gallups testified that he and representatives from defendant set up a payment schedule for plaintiff around the first of February 2008, after his check was returned, and, when he did not make a payment under the new schedule, defendant terminated the contract.  Plaintiff alleges that a jury should "decide if any delay in payment was unreasonable or cause to terminate."  However, plaintiff does not contend that it merely delayed its payments; Gallups testified that he did not owe the money at all because of the offset of unpaid commissions.

Nonpayment is a substantial and material breach of the Agreement. *See Alabama Football, Inc. v. Stabler*, 319 So. 2d 678, 681-82 (Ala. 1975). "Under general principles of contract law, a substantial breach by one party excuses further performance by the other." *Nationwide Mutual Insurance Co. v. Clay*, 525 So. 2d 1339, 1343 (citing *Smith v. Clark*, 341 So. 2d 720 (Ala. 1977)); *see also Anvil Min. Co. v. Humble*, 153 U.S. 540, 552 (1894), *quoted in Waters v. Weintraub*, 52 So. 2d 510, 534-35 (Ala. 1951); *Dow Chemical Co. v. United States*, 226 F.3d 1334, 1346 (Fed. Cir. 2000)("A material breach, or repudiation, gives rise to a right to exercise a termination provision in a contract. Moreover, under the circumstances of this case, the absence of an express termination clause would not ordinarily prevent a party from ending the contract." (internal citations omitted)). "Unless a contract provision for termination for breach is in terms exclusive, it is a cumulative remedy and does not bar the ordinary remedy of termination for a breach which is material, or which goes to the root of the matter or essence of the contract." *Olin Corp. v. Central Industries, Inc.*, 576 F.2d 642, 647-48 (5th Cir. 1978)(interpreting Mississippi law); *see Solitron Devices, Inc. v. Honeywell, Inc.*, 842 F.2d 274, 278 (11th Cir. 1988)("A default termination clause in a contract enables a party to terminate its own performance and bring suit against the breaching party. Where the contract has already been terminated by the party allegedly in breach, the suing party's compliance or lack of compliance with the termination clause is irrelevant."); *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 652 (Pa. 2009)("[W]hen there is a breach of contract going directly to the essence of the contract, which is so exceedingly

15

grave as to irreparably damage the trust between the contracting parties, the non-breaching party may terminate the contract without notice, absent explicit contractual provisions to the contrary.  [R]equiring such notice before termination under such circumstances would be a useless gesture, as such a breach may not reasonably be cured.").

The Early Termination Clause of the Agreement does not state that it is the exclusive means of terminating the Agreement.  Therefore, the court finds that defendant was not barred from terminating the Agreement for a material breach.

Moreover, the court finds that plaintiff's failure to pay for the AgLime it sold to its customers is a material breach.  The court finds plaintiff's arguments – that it did not breach the Agreement because its payments were only delayed and defendant owed it an offset for more than it owed –  are without merit.  Nothing in the Agreement supports plaintiff's assertion that it was due a 12% commission on the amount it owed defendant for AgLime.  Also, the record does not support Gallups's testimony that plaintiff's failure to make payments for AgLime sold from October through February was acceptable pursuant to the parties' course of the performance or that plaintiff ever intended to pay the amounts.[5]

---

[5]Gallups testified:

Q.  So you talked about the 12 percent and the amounts owed and due Lafarge based on the per ton price.  So you're basically claiming that you didn't pay Lafarge the amounts that it was due based on the tonnage sold because you were setting off your 12 percent commission?

A.  That's right.

16

Plaintiff's breach-of-contract claim based on the Early Termination Clause is due to be dismissed.

Plaintiff also claims defendant breached the Agreement by failing to honor sales made by plaintiff.   Plaintiff argues:

> This claim is merely based on the premise that the premature and improper termination of the Agreement directed sales to [defendant], and further sales which would have been made by [plaintiff] were, in effect, refused.  [Plaintiff] was entitled to the sales and commissions based on sales to its customers at the time of and subsequent to the improper and ineffective termination.  All profits from these sales have flowed to [defendant] as the direct seller, to the detriment of [plaintiff].

(Doc. 18 at 20.)

Because the court finds that plaintiff has not established that defendant improperly terminated the agreement, this claim cannot survive.  Therefore, plaintiff's breach of contract claim based on sales after the termination is due to be dismissed.

## 2.  Selling the Product Directly to Customers Without Paying the Plaintiff Commissions

Plaintiff argues that defendant's dealings with Strata breached the parties' Agreement that plaintiff was defendant's exclusive agent.  As stated above, defendant denies that its sold any product to Strata and plaintiff has not disputed this fact.  Indeed, plaintiff is careful not to argue that defendant actually "sold" AgLime to Strata.[6]

---

(Doc. 15, Ex. C at 160-61.)

[6]Plaintiff contends, "During the term of the Agreement Lafarge engaged in business activity at the Calera plant involving Strata and Mobile Asphalt which resulted in a loss to Ag Products of sales of aglime in the South Alabama area, in direct competition with Ag

Plaintiff's Complaint alleges that defendant breached the parties Agreement by "selling the product directly to customers without paying the Plaintiff commissions." (Doc. 1, Att. [Complaint at 3].)  Without some evidence that defendant actually sold AgLime, this claim is due to be dismissed.

The court also notes that naming plaintiff as the "exclusive sales agent" for AgLime from defendant's Calera quarry did not prohibit defendant from selling AgLime directly to customers.  Alabama law recognizes that an "exclusive agency" agreement ***does not*** prevent the owner from selling the object of the agency; it only prohibits the owner from selling the object through another agent or to a buyer procured by the exclusive agent.  *Moreno v. May Supply Co.*, 190 So. 2d 710, 712 (Ala. 1966).[7]

_____

Products.  Officials of Lafarge acknowledged the conflict and ordered a halt to the activity after Ag Products complained.  The dealings violated the Agreement between Ag Products and Lafarge and between 25,000– 40,000 tons of Ag Products sales were circumvented by this action. Lafarge received $2.00 per ton for the resulting product."  (Doc. 18 at 21.)

[7]The *Moreno* court held:

There are several cases holding that . . . where an exclusive agency is given a broker, the owner may still sell the property without liability for commissions unless the broker has procured a purchaser ready and able to buy. . . . .

Further, we think there is a distinction between an exclusive agency and an exclusive right to sell conferred by contract.  . . .

The ordinary rule is that an owner is precluded from selling the property himself while bound by a contract granting the broker an Exclusive right to sell – for a term at least – as distinguished from contracts granting merely an exclusive agency, which are universally recognized to preclude, at most, the sale of property through another

Plaintiff does not cite any Alabama law to the contrary.  Although defendant denies that it actually sold anything to Strata, defendant could sell its own product to Strata without violating the "exclusive agency" agreement.  Therefore, even if plaintiff had presented evidence sufficient to establish a question of fact regarding defendant's sale of AgLime, the court would dismiss plaintiff's breach of contract claim because the Agreement does not prohibit defendant from selling AgLime directly to customers.

### 3.  Failing to Pay 12% Commission for the Entire Term of the Agreement

Plaintiff alleges that defendant breached the Agreement by failing to pay it 12% of the per-ton price sales.  In 2004, defendant changed the method of compensation to charging plaintiff a set price per ton and allowing plaintiff to keep any amount of the aggregate sales price over the per-ton price defendant charged plaintiff; the parties did not enter into a new written Agreement.  Therefore, plaintiff argues, it remained entitled to 12% commission on the per-ton price sales between plaintiff and defendant under the parties' original Agreement.

The court disagrees.  Nothing in the written Agreement gives plaintiff the right to a commission on the amount remitted to defendant.  The written Agreement allows plaintiff a commission based on the price it charged its customers – the aggregate sales price.  The change to per-ton pricing did not modify this provision.  The change to per-ton pricing

---

broker.

*Moreno*, 190 So. 2d at 712.

merely eliminated the part of the Agreement that required plaintiff to calculate 88% of the aggregate sales price and replaced it with the per-ton price invoice.

Even if the court assumes that the change to per-ton pricing did not change the amount of plaintiff's compensation – 12% of aggregate sales price,[8] plaintiff must prove that its profit from the aggregate sales price less the amount owed defendant for AgLime at the per-ton price was less than 12% percent to establish a breach of the parties Agreement. Plaintiff, for purposes of summary judgment, has admitted that it received more than 12% of the aggregate sales price after the modification and before the agreement was terminated. (Doc. 14 at 8; doc. 18 at 7.) Therefore, plaintiff has not established defendant breached the Agreement.

The court will dismiss plaintiff's breach-of-contract claim based on defendant's alleged failure to pay a 12% commission.

## B.  UNPAID COMMISSIONS

For the reasons set forth above, the court finds that plaintiff cannot establish a claim for unpaid commissions.

---

[8]According to Gallups's deposition testimony, he performed according to the per-ton modification. This performance appears sufficient to have modified the written Agreement with regard to the payment terms. *See Conference America, Inc. v. DHL Exp. (USA), Inc.*, 2:08cv110-SRW, 2009 WL 3806411, *13 (M.D. Ala. Nov. 12, 2009)(quoting *Lilley v. Gonzales*, 417 So. 2d 161, 163 (Ala. 1982)).  However, because plaintiff cannot prove any damages arising from his breach of contract claim based on the failure to pay a commission, the court assumes that the modification was limited to invoicing the per-ton price.

Alabama law defines a "commission" as "Compensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the dollar amount of certain orders or sales." Ala. Code § 8-24-1(1). Following the change to per-ton pricing, plaintiff's compensation was no longer expressed as a percentage of sales; rather, plaintiff's compensation was the difference between the price plaintiff charged its customers and the per-ton price defendant charged plaintiff.

Even if the court assumes that plaintiff was entitled to 12% of the aggregate sales price after the change to per-ton pricing, plaintiff cannot establish a cause of action under Alabama law. Alabama law requires the principal to pay the agent this amount within the time allowed by the Agreement. Under the terms of the Agreement, however, defendant did not pay plaintiff a commission; rather, plaintiff retained the commission and remitted the remainder of the aggregate sales price. Therefore, plaintiff cannot establish a violation of the parties' Agreement to pay a commission.

Also, plaintiff has admitted that it actually retained more than 12% of the aggregate sales price after the change to the per-ton pricing. Therefore, plaintiff cannot establish that defendant owes it any amount as commission.

Based on the foregoing, the court finds that defendant's Motion for Summary Judgment is due to granted and plaintiff's claim for unpaid commission will be dismissed.

## C.  DEFENDANT'S BREACH OF CONTRACT COUNTERCLAIMS

Defendant contends that it is entitled to summary judgment as to its counterclaims.

(Doc. 13; doc. 14.)  It argues:

> As established herein, Lafarge may recover on its breach of contract counterclaim against Agricultural Products if it can establish (1) the existence of a valid contract binding the parties, (2) its own performance under the contract, (3) the Agricultural Products' own nonperformance under the contract, and (4) resulting damages.  Lafarge fully performed under the Agreement, as it supplied AgLime to Agricultural Products as needed during the entire term of the Agreement.

> However, Agricultural Products admitted that it did not pay the $237,383.16 in outstanding invoices for the months of October 2007 through February of 2008, because it was "offsetting" the 12 percent commission it believed it was owed based on the original terms of the Agreement. [Plaintiff] does not contest that validity of the invoices submitted by Lafarge, and has admitted that the amounts reflected on the invoices for the months of October 2007 through February 2008 correctly reflect the amount of AgLime sold by Agricultural Products to be supplied by Lafarge.  As established herein, Agricultural Products is not owed any outstanding commissions, and its refusal to remit payment to Lafarge was therefore a material breach of the terms of the Agreement.  As a result of Agricultural Products' material breach, Lafarge has been damaged in the amount of $237,383.16.

> Lafarge also has a separate claim for the amount of the check that was returned for the insufficient funds.  The unpaid amount of that check is included in the $237,383.16 Lafarge seeks under the Agreement. To the extent the Court funds that the full amount of $237,383.16 is not due, Lafarge certainly is entitled to a judgment for the unpaid amount of the check that was returned for insufficient funds.

(Doc. 14 at 28-30.)

Plaintiff does not dispute that the amounts requested by defendant for unpaid invoices

is due; it contends only that it is entitled to an offset for unpaid commissions.  As set forth

above, plaintiff is not entitled to the unpaid commissions.  Therefore, the court will grant defendant's Motion for Summary Judgment as to its Counterclaim.  Judgement in favor of defendant on Count I of its Counterclaim in the amount of $237,383.16 will be entered by separate Order.  Count II of its Counterclaim, the claim for the amount of the check that was returned for insufficient funds, will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 29th day of March, 2010.

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE